IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KATHARINE E. WEBB,

                                        Plaintiff,

          v.                                                              OPINION and ORDER

PLAYMONSTER LLC,                                                          23-cv-442-jdp

                                        Defendant.

---

Plaintiff Katharine E. Webb worked for defendant Playmonster LLC as an accounts receivable clerk from October 2020 to August 2021, when she was terminated. Webb contends that Playmonster fired her because she was pregnant and because it did not want to give her medical leave, in violation of Title VII of the Civil Rights Act of 1964 and the Family and Medical Leave Act (FMLA).

Webb moved for default judgment after Playmonster failed to answer the complaint. Dkt. 27. Playmonster neither responded to the motion nor appeared at the default hearing. For the reasons explained below, the court will enter judgment in Webb's favor under both Title VII and the FMLA, award $150,176.12 in damages, $22,237.50 in attorney fees and $587 in costs.

ANALYSIS

The court will address the following issues in this opinion: (1) personal jurisdiction and service; (2) liability; (3) Playmonster's number of employees; (4) damages; and (5) attorney fees and costs.

## A.  Personal jurisdiction and service

A defaulting defendant does not waive defects in personal jurisdiction. *See be2 LLC v. Ivanov*, 642 F.3d 555, 557–58 (7th Cir. 2011); *Swaim v. Moltan Co.*, 73 F.3d 711, 717 (7th Cir. 1996). The court may exercise personal jurisdiction if service is proper and the plaintiff shows two things: (1) the defendant purposefully availed itself of the privilege of conducting business in the forum state or purposefully directed its activities at the state; and (2) the plaintiff's alleged injury arose out of the defendant's forum-related activities. *Curry v. Revolution Labs., LLC*, 949 F.3d 385, 398 (7th Cir. 2020). In this case, Webb served the complaint on Playmonster's registered against in Wisconsin, Dkt. 12 and Dkt. 16, and her claim arises out of her employment with Playmonster in Beloit, Wisconsin, so the court may exercise personal jurisdiction over Playmonster.

## B.  Liability

The court must accept as true Webb's allegations about liability, *Arwa Chiropractic, P.C. v. Med-Care Diabetic & Medical Supplies, Inc.*, 961 F.3d 942, 948 (7th Cir. 2020), but the court must still determine whether her allegations state a claim, *Quincy Bioscience, LLC v. BRYK Enterprises, LLC*, No. 22-cv-658-jdp, 2023 WL 2933464, at *3 (W.D. Wis. Apr. 13, 2023). The question is whether Webb's allegations provide enough context to state a plausible claim, or, stated another way, whether the allegations would give notice to Playmonster regarding what it is accused of and allow the court to draw the reasonable inference that Playmonster is liable for the misconduct alleged. *See Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 356 (7th Cir. 2020); *McCray v. Wilkie*, 966 F.3d 616, 620 (7th Cir. 2020).

Webb asserts four causes of actions: (1) termination because of sex in violation of Title VII; (2) "disparate treatment" because of sex in violation of Title VII; (3) interference with

medical leave in violation of the FMLA; and (4) retaliation for taking medical leave, in violation of the FMLA. The interference claim and retaliation claim are based on the same alleged conduct, which is terminating Webb to prevent her from using medical leave. And Webb doesn't identify separate damages for the interference and retaliation claims, so the court will examine them together.

### 1. Termination because of sex

As for the first claim, Title VII prohibits discrimination because of sex, which includes discrimination on the basis of pregnancy. 42 U.S.C. § 2000e(k). To support that claim, Webb points to the following allegations in her amended complaint:

- When Webb told Playmonster she was pregnant and asked for permission to work remotely to accommodate pregnancy-related symptoms, Playmonster initially denied that request.  Dkt. 9, ¶ 17.

- Webb was on a performance improvement plan when she told Playmonster she was pregnant, but Playmonster did not assess her progress on the plan until after she announced her pregnancy. *Id.*, ¶ 31.

- Webb was fired less than a month after informing Playmonster she was pregnant. *Id.*, ¶¶ 16, 33, 37.

- The performance improvement plan had been in place only two months when she was fired, and Playmonster acknowledged that she had made "some improvement." *Id.* ¶ 33.

These allegations would not be enough to prevail at summary judgment or trial. But pleading requirements are not onerous. Webb alleges that Playmonster was reluctant to give her accommodations for her pregnancy and then quickly fired her after learning she was pregnant. Those allegations at least bring her claim above the level of speculation, which is enough to state a plausible claim. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### 2.  Other disparate treatment because of sex

Webb identifies two instances of what she calls disparate treatment because of her pregnancy: (1) a one-week delay in approving her request to work remotely; and (2) conditioning her remote work on new requirements to keep her supervisor apprised of her productivity. Webb alleges that these decisions were discriminatory because Playmonster allowed other employees to work remotely and without requiring them to check in like she did. But Webb did not identify any damages related to the claim, either in her motion or during the default hearing, so the court will dismiss this claim.

### 3.  Interference with medical leave

The FMLA gives employees the right to take up to 12 weeks of leave for various reasons, including for a "serious health condition." 29 U.S.C. § 2612(a)(1). The employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" the right to take medical leave. 29 U.S.C. § 2615(a).

Webb's claim is that Playmonster terminated her to avoid giving her medical leave related to her pregnancy. Leave needed for the birth of a child or for pregnancy complications is protected by the FMLA. 29 U.S.C. § 2612(a)(1)(A); *Aubuchon v. Knauf Fiberglass GmbH*, 359 F.3d 950, 951 (7th Cir. 2004).

To support this claim, Webb relies primarily on her allegation that she was terminated shortly after a human resources employee wrote in an email in August 2021 that Webb would "qualify for FMLA the first week in October" and that "we need to term her, if warranted, as soon as possible." Dkt. 9, ¶ 35. Webb did not file a copy of the email, and the complaint does not include the full context of the quotes. But the allegation is enough to make Webb's claim plausible. It is suspicious that Playmonster would discuss the need to terminate Webb "as soon

as possible" in the same email that discusses Webb's imminent eligibility to take leave under the FMLA.

The court concludes that Webb has stated a claim that Playmonster terminated her because of her pregnancy and interfered with her medical leave.

## C. Number of employees

Playmonster's number of employees is relevant to both liability and damages. As for liability, both Title VII and the FMLA apply only if there is a minimum number of employees. For Title VII, the minimum is 15 employees. 42 U.S.C. § 2000e(b). The FMLA applies only to companies that have at least 50 employees within 75 miles of the plaintiff's worksite. 29 U.S.C. § 2611(2)(B).

As for damages, Title VII places a cap on compensatory and punitive damages that varies depending on how many employees the defendant has. Compensatory damages are defined as "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). The cap is $50,000 if the defendant has more than 14 or fewer than 101 employees; $100,000 if the defendant has more than 100 but fewer than 201 employees; $200,000 if the defendant has more than 200 but fewer than 501 employees; and $300,000 if the defendant has more than 500 employees. 42 U.S.C. § 1981a(b)(3).

Even when the defendant defaults, the plaintiff must prove her damages with reasonable certainty. *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 602 (7th Cir.2007); *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004). So allegations are not enough for determining the appropriate damages cap; Webb must submit evidence on the number of Playmonster's employees.

An initial question that Webb does not directly address is what the relevant time frame is for determining the number of employees. At the time of the alleged discrimination? At the time the lawsuit was filed? The time judgment is entered? For the purpose of determining liability under § 2000e(b) of Title VII, the question is whether the employer had the requisite number of employees for "each of twenty or more calendar weeks in the current or preceding calendar year." The court of appeals has construed "current or preceding calendar year" to mean "the year the alleged discrimination occurred or during the year preceding the discrimination." *Komorowski v. Townline Mini-Mart and Restaurant*, 162 F.3d 962, 966 (7th Cir. 1998). The Title VII damages cap provision uses similar language as § 2000e(b), so courts have construed the two provisions the same way. *See, e.g., Equal Employment Opportunity Commission v. Village at Hamilton Pointe LLC,* No. 17-cv-00147-RLY-MPB, 2020 WL 13568924, at *33 (S.D. Ind. Sept. 29, 2020); *Mendez v. Perla Dental*, No. 04 C 4159, 2008 WL 821882, at *3 (N.D. Ill. Mar. 26, 2008). The court of appeals has also assumed that the relevant time frame under the FMLA is when the alleged violation occurred. *See Cuff v. Trans States Holdings, Inc.,* 768 F.3d 605, 607 (7th Cir. 2014). The violations in this case occurred in 2021, so the relevant time frame is 2020 and 2021.

Webb's basis for determining the number of employees has been a bit of a moving target. In her motion, Webb relied on several third-party websites (RocketReach, Crunchbase, VisualVisitor, Owler, and ZoomInfo) to propose an estimate of 204 employees. But these websites are hearsay, Webb cited no authority suggesting that the court could rely on the websites, and she cited no evidence that the websites were reliable. So the court directed Webb to supplement her motion with "evidence showing the number of defendant's employees or

authority showing that the court may rely on the websites plaintiff cited to determine the number of employees." Dkt. 28.

In her response to that order, Webb abandoned any reliance on the websites she cited in her motion. Instead, she relied on the following new information to establish the number of employees:

- a declaration from Webb herself that she was "aware of" 85 employees at Playmonster's Beloit facility when she worked there in 2020 and 2021, and she was aware of 15 employees "who worked at locations other than my work location of Beloit, Wisconsin." Dkt. 31.

- a "Dun & Bradstreet identifier" indicating that Playmonster LLC had 55 employees in 2021.

- a photo on Playmonster's "Employment" webpage showing 68 people.

- Playmonster's LinkedIn and Indeed profiles, identifying its size as "51–200 employees."

- A webpage in Westlaw's "Business Finder" database showing that Playmonster LLC currently has "100 to 249 employees."

Dkt. 29, at 5.[1]

Two days before the hearing, Webb filed a new declaration regarding Playmonster LLC's number of employees. Dkt. 38. Webb's lawyer stated that Webb was "no longer relying on Playmonster.com" to show Playmonster's number of employees. Instead, Webb was relying

---

[1] Webb also stated that that the court may infer that Playmonster had the requisite number of employees from the fact that it never raised the issue during administrative proceedings. Dkt. 29, at 5. But to support that assertion, Webb cited what purports to be an administrative response from "Playmonster Group LLC," not Playmonster LLC. Dkt. 30-1. That not only undermines any inferences that may be drawn from the document about Playmonster LLC, it also raises questions about whether Webb properly exhausted her administrative remedies against the proper party. But failure to exhaust is an affirmative defense, so Playmonster LLC waived that defense by failing to answer the complaint.

on only three documents to show Playmonster's number of employees: Playmonster's LinkedIn profile, its Indeed profile, and a newly filed document obtained from Westlaw called a Company Investigator Report. Dkt. 38, ¶ 6. Webb's lawyer did not say whether Webb was withdrawing her declaration that included an estimate of employees.

The Westlaw document is a 13-page report with various pieces of information about Playmonster LLC. Dkt. 30-1. It mentions Playmonster's number of employees in four different places:

- On page 2, under "Business Overview," it includes the line "Number of Employees: 100 to 249."

- On page 9, under "Business Finder Records," it includes the line, "Number Employees at location: 100 to 249." The location it gives is in Beloit, which is where Webb worked.

- On page 10, under "D&B Market Identifier Records," it states, "Employees total: 94."

- On page 11, under the same major heading, it states "Employees total: 94." But it also states "3-Yr-Ago: 55" and" Employees Here: 32." The address is for the same Beloit location listed elsewhere.

Webb's counsel did not say in her declaration which portion of the report Webb was relying on. During the hearing, Webb's counsel said that Webb was relying on the information in the report showing that Playmonster has "100 to 249" employees.

After the hearing, Webb submitted a new declaration in which she said that she was aware of at least 103 employees at Playmonster while she worked there. Dkt. 40.

The court finds that Playmonster had at least 50 but no more than 100 employees in 2020 and 2021. That finding is consistent with most of the evidence Webb submitted, including her initial declaration, the LinkedIn and Indeed profiles, the photograph on

Playmonster.com (which Webb's counsel represented was taken while Webb was an employee), the Dun & Bradstreet identifier, and some of the information in the Westlaw report.

The court declines to credit Webb's new declaration for two reasons. First, Webb does not even attempt to explain why she came up with a different estimate in her initial declaration. She does not identify new information that she remembered or uncovered. And it was only after the court told Webb and her counsel that it would apply the $50,000 damages cap that she increased her estimate. *Cf. Abraham v. Washington Grp. Int'l, Inc.*, 766 F.3d 735, 741 (7th Cir. 2014) (declining to consider a declaration that contradicted previous sworn testimony because the declarant did not provide "a credible explanation for the discrepancies").

Second, some of the information in the declaration is questionable. For example, Webb says that she was aware of 86 employees to whom she sent holiday cards, and she separately counts two vice presidents at the company. Dkt. 40, ¶¶ 4, 6. But she doesn't explain why the two vice presidents would not have been included in the 86 employees that she previously identified. Webb also refers to seven unnamed employees who she says worked in an office in England. *Id.*, ¶ 8. But she does not provide any foundation for finding that the individuals who worked in another country were employed by Playmonster LLC rather than some affiliated entity.

The court's finding that Playmonster had at least 50 but no more than 100 employees means two things. First, Playmonster had enough employees to be sued under both Title VII and the FMLA., so the court concludes that Playmonster is liable under both statutes. Second, the cap for compensatory and punitive damages under Title VII will be $50,000.

### D. Damages

Webb does not seek reinstatement or any other injunctive relief. But she seeks four types of damages: (1) backpay; (2) prejudgment interest on lost wages; (3) liquidated damages; and (4) compensatory and punitive damages.

#### 1. Backpay

Both Title VII and the FMLA allow for recovery of backpay. 29 U.S.C. § 2617(a)(1)(A)(i)(I); 42 U.S.C. § 2000e-5(g)(1). The damages cap in Title VII does not apply to backpay. 42 U.S.C. § 1981a(b)(2). Backpay includes both lost wages and lost benefits, but Webb seeks only the wages she lost from not working at Playmonster after August 27, 2021 (the day she was terminated) until February 2024, which is $98,821. From the total wages she says she could have earned from Playmonster, she subtracts the wages she did earn during that time period, which is $21,673. She does not seek front pay.

Webb's backpay request is based on three premises: (1) Webb would have received a $.25 hourly raise each year at Playmonster; (2) she would have continued working at Playmonster until 2024; and (3) she would have worked 40 hours a week, every week, from the day she was terminated until the present, except for time that she was receiving paid leave. It is reasonable to infer that Webb would have received modest wage increases, so the court will include those in the calculations. It is also reasonable to infer that Webb would have continued working at Playmonster for an extended period. Webb says in her declaration that she believed her job with Playmonster "would be [her] long-term career" based on representations that Playmonster made to her when it hired her. Dkt. 24, ¶ 36.

But Webb has not shown with reasonably certain evidence that she would have consistently worked 40 hours a week after August 2021 and that she would stayed with

Playmonster through 2024. As an initial matter, the timeline regarding Webb's employment after Playmonster is a little hazy. Webb says that she held two jobs after her termination. First, she sold insurance for about three months, and later she worked for a chiropractor's office. In the declaration she submitted before trial, Webb said that she started selling insurance "[o]nce I was able to work following my daughter's birth." Dkt. 24, ¶ 38. But during the hearing, Webb said that she sold insurance from November 2021 to January 2022, and that she gave birth in late March 2022. The court concludes that Webb's hearing testimony is more credible than her original declaration because her hearing testimony is consistent with a tax record reporting income from the insurance company in 2021, Dkt. 22-1, and a medical record showing that Webb was still pregnant in March 2022, Dkt. 22-6, at 3.

In her declaration and during the hearing, Webb admitted that there were significant gaps in her employment after she was terminated and that she never worked more than 30 hours a week. Her declaration gave no explanation for the gaps or the reduced hours. During the hearing, Webb testified that she had difficulty finding a job after she was terminated. She ended up settling for the insurance job, even though it was based on commissions, something she found difficult and stressful. After three months, she was not satisfied with her pay and could not tolerate the stress, so she quit. She did not find another job before giving birth.

Regarding the period after she gave birth, Webb's initial testimony was simply that she stayed home until July 2023, but she would have had eight weeks of paid leave from Playmonster. Later in the hearing, Webb testified that she did look for work before July 2023, but she was unable to find anything. She admitted that she would have taken four weeks of unpaid maternity leave if she had been working at Playmonster and that she made the voluntary decision to stay at home by the end of 2022.

As for the reduced hours at her job with the chiropractor's office, Webb said they were necessary for reasons related to childcare. But she also said that finding childcare became more difficult after she moved, and she may not have moved if she had stayed with Playmonster.

In a declaration filed after the hearing, Webb says that she "continued to search for customer service positions after 2022 and submitted multiple job applications in 2023." Dkt. 40, ¶ 12. She does not elaborate, but she attaches what she calls a copy of her "Lincoln Financial application list," *Id.*, ¶ 14. The document is titled "Candidate Profile," and it lists eight positions under the heading "Jobs Applied." Dkt. 40-1. Under each position is a date and a location, all of which are outside Wisconsin. *Id.* Webb does not provide any testimony explaining what the document is, what it means, or where it came from.

The court finds that Webb would have continued working full time at Playmonster until she gave birth and then she would have taken three months of leave, two of which would have been paid by Playmonster. After returning to work, she would have continued working full time for Playmonster until the end of 2022, after which she would have decided on her own to stay at home with her daughter. The court also finds that Webb voluntarily chose to work fewer than 40 hours for childcare reasons when she returned to work in July 2023.

The court will not credit Webb's last-minute declaration that her decision to stay home during the first half of 2023 was involuntary. Webb does not acknowledge the discrepancy with her hearing testimony, let alone explain why she is changing that testimony. And her declaration is vague regarding the efforts she made to continue working in 2023.

The court also will not credit Webb's testimony that she might not have moved or needed to work fewer hours for childcare reasons if she had stayed with Playmonster. That testimony is speculative, not reasonably certain.

The court will award Webb lost wages through the end of December 2022 and subtract another four weeks for unpaid maternity leave that Webb says she would have taken. The pay she would have made at Playmonster breaks down as follows:

| TIME PERIOD | HOURLY RATE | NUMBER OF WEEKS | TOTAL |
|---|---|---|---|
| 8/27/21–10/9/21 | $19 | 6.2 | $4,712 |
| 10/10/21–10/9/22 | $19.25 | 48 | $36,960 |
| 10/10/22–12/31/22 | $19.50 | 12 | $9,360 |
| | | | **$51,032** |

From the total of $51,032, the court subtracts $8,399 that Webb made working for the insurance company in 2021, for total lost wages of $42,633. The court will not subtract the unemployment benefits Webb received during that time. *See Hunter v. Allis-Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1429 (7th Cir. 1986).

### 2. Prejudgment interest

The decision to award interest on backpay is generally a matter of the district court's discretion, *Pickett v. Sheridan Health Care Ctr.*, 813 F.3d 640, 646 (7th Cir. 2016), but prejudgment interest calculated at the "prevailing rate" is required under the FMLA, 29 U.S.C. § 2617(a)(1)(A)(ii). Webb assumes that "prevailing rate" means the federal prime rate, and courts have done the same. *See, e.g., Rasic v. City of Northlake*, No. 08 C 104, 2010 WL 3365918, at *11 (N.D. Ill. Aug. 24, 2010). When the prime rate has changed during the relevant time period, courts use the average prime rate during that time. *See Frey v. Coleman*, 903 F.3d 671, 682 (7th Cir. 2018). There is a presumption that the plaintiff is entitled to compound interest. *Am. Nat.'l Fire Ins. v. Yellow Freight Sys.*, 325 F.3d 924, 937 (7th Cir. 2003). Webb asks for the

interest to be compounded annually, which is consistent with what this court has done. *See*
*J.K.J. v. Polk Cnty.*, No. 15-cv-428-wmc, 2018 WL 2271166, at *2 (W.D. Wis. May 18, 2018);
*Ruppert v. Alliant Energy Cash Balance Plan*, No. 08-cv-127-bbc, 2011 WL 13134639, at *3
(W.D. Wis. Mar. 18, 2011).

The court will award Webb prejudgment interest at the average prime rate between
August 2021 and April 2024, which was 6.27 percent. Compounded annually, that results in
a total of $7,455.06.[2]

### 3. Liquidated damages under the FMLA

A prevailing plaintiff in an FMLA case is entitled to "liquidated damages equal to the
sum of" the plaintiff's back pay and the interest on the backpay, unless the employer proves
that it acted in good faith or reasonably believed that it was complying with the FMLA. 29
U.S.C. § 2617(a)(1)(A)(iii). Playmonster has not shown that it acted reasonably or in good
faith, so Webb is entitled to liquidated damages. The sum of Webb's backpay and prejudgment
interest is $50,088.06.

### 4. Compensatory damages and punitive damages under Title VII

Webb seeks damages for emotional distress and physical pain and suffering. She also
seeks punitive damages, which are available under Title VII when a plaintiff demonstrates that
the defendant engaged in intentional discrimination "with malice or with reckless indifference
to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). (The

---

[2] The court applied the following formula: $((P(1 + r)^t) - P)$, in which P is the principal (the
court's award of $42,633 in back pay), r is the interest rate compounded annually (6.27
percent), and t is time in years (2.65). *See Mlsna v. Union Pacific Railroad Company*, No. 18-cv-
37-wmc, 2021 WL 3367245, at *8 n.6 (W.D. Wis. Aug. 3, 2021).

14

FMLA does not allow punitive damages or damages for emotional or physical pain and suffering.) As previously discussed, the cap for these damages is $50,000.

A threshold problem with Webb's request for punitive damages is that she cites no evidence to support it. In her motion, she relied entirely on her complaint to support a finding that Playmonster acted maliciously or with reckless indifference to her rights. As already discussed, the plaintiff may rely on her complaint to prove liability, but not to prove damages. During the hearing, Webb did not supplement the record with evidence about Playmonster's malice or reckless disregard of her rights. So the court will not award any punitive damages.

As for physical pain and suffering, Webb relied solely on her own testimony to prove causation. She stated in her declaration that she suffered from the following symptoms because of her termination: "dizzy spells" during her pregnancy, *id.*, ¶ 28; insomnia, *id.* ¶ 29; a "high risk" pregnancy, *id.*, ¶ 31; a caesarean birth, *id.*, ¶ 32, and an inability to breastfeed her child, *id.* ¶ 34. During the hearing, Webb also said that her baby suffered from colic and acid reflux because of the stress Webb experienced from her termination.

As a lay witness, any opinion that Webb offers must be rationally based on her own observations. Fed. R. Evid. 701. She may not offer expert testimony. Fed. R. Evid. 702. A lay witness is not qualified to testify about the causes of various medical symptoms and conditions, *see Myers v. Illinois Central R. Co.*, 629 F.3d 639, 643–44 (7th Cir. 2010); *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001), so the court cannot award damages for Webb's physical pain

and suffering.[3]

As for emotional distress, Webb testified both in her declaration and during the hearing that being terminated while she was pregnant created great emotional distress about whether she and her husband would be able to afford all the expenses associated with having a baby. She also testified that she became so depressed that she started taking antidepressants. She even questioned whether she would ever get pregnant again because the experience was so traumatic.

The court finds Webb's testimony about her emotional distress to be credible. Under these circumstances, the court finds that the evidence supports an award of $50,000 for emotional distress.

## E.  Attorney fees and costs

Both Title VII and the FMLA authorize an award of reasonable attorney fees. 42 U.S.C. § 2000e-5(k); 29 U.S.C. § 2617(a)(3). Counsel seek $22,237.50 in fees. In reviewing a fee-shifting petition, the court uses the lodestar method, which looks at both the reasonableness of the hours expended and the reasonableness of counsel's rates. *Pickett v. Sheridan Health Care Center*, 664 F.3d 632, 639–40 (7th Cir. 2011). In this case, Webb seeks reimbursement for 106.5 hours of work by four lawyers, with rates ranging from $175 an hour for an associate to $325 an hour for a managing partner. The court finds that the time spent and the hourly rates are reasonable, so the court will grant the request.

---

[3] In a pre-hearing brief, Webb said that she could not provide additional evidence about the causes of her medical conditions "[b]ecause Defendant has not appeared, making discovery impossible." Dkt. 29, at 6. But Playmonster would not have any information about the causes of Webb's own injuries when she was no longer working for Playmonster. That evidence would be within Webb's purview, but she did not develop it.

16

Webb is seeking $652 in costs, which consists of $402 for the filing fee and $250 for service fees. Webb's first attempt to serve Playmonster was unsuccessful because Webb served the wrong entity. The court will subtract $65 for the unsuccessful attempt and award $587.

ORDER

IT IS ORDERED that:

1. The clerk of court is directed to enter judgment in Katharine Webb's favor on her claims that Playmonster LLC terminated her because of her sex in violation of Title VII of the Civil Rights Act of 1964 and interfered with her medical leave in violation of the Family and Medical Leave Act.

2. Webb's claim that Playmonster delayed her accommodation requests and imposed additional requirements on her because of her sex, in violation of Title VII, is DISMISSED with prejudice.

3. The court awards Webb $42,633 in backpay, $7,455.06 in prejudgment interest, $50,088.06 in liquidated damages, and $50,000 for emotional distress, for a total of $150,176.12.

4. The court awards $22,237.50 in attorney fees and $587 in costs.

5. The clerk of court is directed to close this case.

Entered April 18, 2024.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge